Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

Felicia Gilbert **(CA Bar #276348)**
SANFORD HEISLER SHARP, LLP
111 Sutter Street, Suite 975
San Francisco, Ca 94104
Tel: (415) 795-2020
Fax: (415) 795-2021
fgilbert@sanfordheisler.com

H. Vincent McKnight, Jr. (DC Bar #293811)
John McKnight (DC Bar #1031354)
Robert Van Someren Greve (DC Bar # 1617234)
SANFORD HEISLER SHARP, LLP
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Tel: (202) 499-5211
Fax: (202) 499-5199
vmcknight@sanfordheisler.com
jmcknight@sanfordheisler.com
rvansomerengreve@sanfordheisler.com

*ATTORNEYS FOR RELATORS*

**FILED UNDER SEAL**

**FILED**

May 06 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| [SEALED],<br>*ex rel.* [SEALED],<br><br>    PLAINTIFF/RELATORS<br><br>        v.<br><br>[SEALED],<br><br>    DEFENDANTS. | Case No.  CV 21-3395 DMR<br><br><br>**COMPLAINT - JURY DEMAND**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT PLACE IN PRESS BOX DO NOT ENTER IN PACER** |

*Complaint*

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

Felicia Gilbert **(**CA Bar #276348**)**
SANFORD HEISLER SHARP, LLP
111 Sutter Street, Suite 975
San Francisco, Ca 94104
Tel: (415) 795-2020
Fax: (415) 795-2021
fgilbert@sanfordheisler.com

H. Vincent McKnight, Jr. (DC Bar #293811)
John McKnight (DC Bar #1031354)
Robert Van Someren Greve (DC Bar # 1617234)
SANFORD HEISLER SHARP, LLP
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Tel: (202) 499-5211
Fax: (202) 499-5199
vmcknight@sanfordheisler.com
jmcknight@sanfordheisler.com
rvansomerengreve@sanfordheisler.com

*ATTORNEYS FOR RELATORS*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* KEVIN KLIMASZEWSKI, <br><br> PLAINTIFF/RELATOR <br><br> v. <br><br> BOX, INC., and CARAHSOFT TECHNOLOGY CORP., <br><br> DEFENDANTS. | Case No. CV 21-3395 DMR <br><br> **COMPLAINT - JURY DEMAND** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **DO NOT PLACE IN PRESS BOX DO NOT ENTER IN PACER** |

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
UNDER 31 U.S.C. §§ 3729, *ET SEQ.***

1.   Relator Kevin Klimaszewski brings this *qui tam* action on behalf of the United States of America pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), as amended, and alleges as follows:

## I.   INTRODUCTION

2.   Defendants Box, Inc. ("Box") and Carahsoft Technology Corporation ("Carahsoft") (jointly, "Defendants") submitted or caused to be submitted false claims to the Government for computer software products for which they charged inflated prices compared to the prices charged to commercial customers. These inflated prices resulted from false statements or omissions to the Government about the pricing of Box sales to non-Government customers. That is, Defendants sold Box products to commercial customers at prices that were significantly lower than those the Government paid.

3.   In addition, for Box products offered through the General Services Administration's Multiple Award System ("GSA MAS"), Defendants neither adjusted their prices to reflect price reductions offered to commercial customers, nor did Defendants refund the Government for price reductions that they should have retroactively provided to the Government.

4.   As a result of Defendants' false and fraudulent statements and claims, Defendants knowingly submitted and caused to be submitted false or fraudulent claims for payment to the United States for the Box products that Defendants sold to the United States. The Government relied on Defendants' representations in agreeing to the prices it would pay for Box products. Had Defendants accurately and truthfully disclosed their pricing for commercial customers, the Government would not have paid the prices it did.

5.   Relators seek to recover damages on behalf of the United States arising from Defendants' knowing violation of 31 U.S.C. 3729 § (a)(1)(A), (B), and (G).

## II.   JURISDICTION AND VENUE

6.    The Court has original subject matter jurisdiction over this civil matter pursuant to 28 U.S.C. §§ 1331 and 1345, as well as 31 U.S.C. § 3732(a).

7.   Venue is proper, and this District Court has personal jurisdiction over

Defendants pursuant to 28 U.S.C. § 1391 (b) and 31 U.S.C. § 3732(a), because Defendant Box has its principal place of business within this District, and both Defendants transact business and committed acts proscribed by 31 U.S.C. §§ 3729 *et seq.* within this District.

8.      Relator is an "original" source, as defined by the FCA, and no allegations set forth in this Complaint are based on public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, or from the news media.

### III.   PARTIES

9.      **Plaintiff the United States of America** is the plaintiff on whose behalf Relator brings this action under 31 U.S.C. §§ 3729 *et seq.* The United States acts through its various agencies and departments, including the General Services Administration, and any government entity that purchases services or products from Defendants.

10.      **Relator Kevin Klimaszewski** is a resident of Delafield, Wisconsin. From October 2018 until November 2020, Relator worked at Defendant Box as a Strategic Account Executive in the company's Sales Division.

11.      **Defendant Box, Inc.** (formerly, "Box.net"), a public company, was founded in 2005 and is headquartered in Redwood City, California. Box provides cloud content management and file sharing services to public and private customers, including both federal and state governments. Box has been publicly traded since January 23, 2015, and is currently traded on the New York Stock Exchange with ticker symbol "BOX."

12.      Defendant Box offers both free and paid personal accounts to individual users, and charges companies and organizations that provide Box to their employees, clients, and/or customers. On its 2020 SEC Form 10-k, Box reports that it had 70.6 million registered users as of January 31, 2020, of which approximately 19% were paying users, and about 97,000 paying companies or institutions that use Box products. Box reported $696.3 million in revenue for the year ending on January 31, 2020, of which approximately 25% was generated from non-U.S. customers.

13.      **Defendant Carahsoft Technology Corp.**, a privately held company, was founded in 2004 and is headquartered in Reston, Virginia. Carahsoft describes itself as

"The Trusted Government IT Solutions Provider®."

14.     Defendant Carahsoft sells Box products under GSA Schedule 70, with Contract Number GS-35F-0119Y, as well as through two Indefinite Delivery, Indefinite Quantity ("IDIQ") contract vehicles: (a) NASA SEWP V (Contract Nos. NNG15SC03B and NNG15SC27); and, until October 12, 2020, (b) ITES-SW (Contract No. W52P1J-15-D-0008). Carahsoft's Data Universal Numbering System ("DUNS") number used for its dealings with the U.S. Government is 088365767, and its Cage Code is 1P3C5.

## IV.   STATUTORY AND REGULATORY CONTEXT

### A.     The False Claims Act.

15.     The FCA, 31 U.S.C. §§ 3729 *et seq.*, was originally enacted in 1863 during the Civil War and was substantially amended by the False Claims Amendments Act of 1986, as signed into law on October 17, 1986. Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the FCA. Congress acted upon finding that (a) fraud in federal programs and procurement is pervasive and that (b) the FCA—which Congress characterized as the primary tool for combating fraud in Government contracting—was in need of modernization.

16.     The FCA was further amended by the Fraud Enforcement Recovery Act ("FERA"), signed into law on May 20, 2009, for the express purpose of strengthening the tools available to combat fraud and to overturn judicial decisions that had weakened the False Claims Act. *See* Pub. L. No. 111-21, 123 Stat. 1617 (2009).

17.     The FCA is the Government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N 5266. It is broadly drafted to reach beyond common law fraud. *Cook Cty. v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003) (holding that the FCA applies "expansively . . . 'to reach all types of fraud, without qualification, that might result in financial loss to the Government'") (quoting

1   *United States v. Neifert-White Co*., 390 U.S. 228, 232 (1968)).

2      18.   The FCA provides that any person who knowingly submits a false or

3   fraudulent claim to the Government for payment or approval is liable for a civil penalty

4   of up to $23,331 for each such claim, plus three times the amount of the damages

5   sustained by the Government, and attorneys' fees and costs. *See* 31 U.S.C. § 3729(a)(1);

6   28 C.F.R. § 85.5.

7      19.   The FCA defines the term "claim" to mean any request or demand for

8   money, whether under a contract or otherwise, presented to an officer, employee, or agent

9   of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand

10  for money made to a contractor or other recipient if (a) the money is to be spent or used

11  on the Government's behalf or to advance a Government program or interest and (b) the

12  Government provides, has provided, or will reimburse such contractor or other recipient

13  for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

14     20.   As defined in the FCA, the terms "knowing" and "knowingly," mean that,

15  with respect to information, a person "(i) has actual knowledge of the information; (ii)

16  acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in

17  reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

18  Thus, to establish that a defendant acted "knowingly" under the FCA, no "proof of

19  specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1).

20     21.   The FCA defines "material" objectively, not subjectively, to mean "having

21  a natural tendency to influence, or be capable of influencing, the payment or receipt of

22  money or property." 31 U.S.C. § 3729(b)(4). This "natural tendency" test has long been

23  the standard in the Ninth Circuit. *See, e.g.*, *United States v. Bourseau*, 531 F.3d 1159,

24  1171 (9th Cir. 2008). The Supreme Court has reaffirmed the natural tendency test and

25  described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. U.S.*

26  *ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). In determining whether a false claim or

27  statement is "capable of influencing" the Government's decision-making process, the

28  FCA's materiality standard looks to the effect on the likely or actual behavior of the

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

government recipient of the misrepresentation. *See U.S. ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1019 (9th Cir. 2018), *cert. denied sub nom. Stephens Inst. v. U.S. ex rel. Rose*, 139 S. Ct. 1464, 203 L. Ed. 2d 684 (2019).

22.     The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action on behalf of the Government. A person who brings a *qui tam* suit under the FCA as a relator on behalf of the Government is entitled to share in any recovery.

23.     A *qui tam* complaint is to be filed under seal for sixty days (without service on the Defendants during such sixty-day period). This enables the Government (a) to conduct its own investigation without Defendants' knowledge or awareness, and (b) to determine whether to join the action.

**B.      The GSA Multiple Award Schedule Program.**

**1.      Overview of the GSA MAS Program.**

24.     Executive agencies of the United States at times need to procure products and services without going through full and open competition every time they need to make a purchase. To accommodate the need of executive agencies to procure products and services without going through full and open competition every time they need to make a purchase, the General Service Administration, through the Federal Acquisition Service, has established a procedure to solicit, negotiate, award, and administer so-called "Multiple Award Schedule" ("MAS") contracts to procure services and products for federal agencies.

25.     The GSA Administrator establishes the rules and procedures that govern the MAS program, including the requirements that contractors must follow to become vendors. Key regulations related to federal purchasing are provided in the Federal Acquisition Regulations ("FAR") at 48 C.F.R. §§ 1-53.303.

26.     Historically, the GSA has negotiated multiple schedules for different types of procurement, *e.g.*, schedules offering professional services, hardware, travel services, and leasing of automobiles and light trucks.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

27.    The GSA IT Schedule 70 Contract, under which Box, through Carahsoft, sells its products to the Government, covers IT products, services, and solutions. Schedule 70 is the largest of all GSA schedules, as it includes more than 4,600 pre-vetted vendors, and had sales in excess of $15 billion for FY 2018.

### 2.    Required Price Disclosures Under GSA MAS Schedule 70.

28.    The current solicitation for Schedule 70 (FCIS-JB-980001-B) states in its introductory materials that awards are based on a "best value" determination defined as an "expected outcome" that "provides the greatest overall benefit in response to the requirement."[1]

29.    Schedule 70 requires an offeror to prepare and submit an offer in accordance with Solicitation Clause 552.212-70.

30.    Solicitation Clause 552.212-70 requires the production of the offeror's commercial descriptive catalog, or price list, from which any discount is offered.

31.    Solicitation Clause 552.212-70 further directs that any price list specially produced for purpose of the offer must "represent a verbatim extract" from the catalog or price list underlying the document. The offeror must also indicate, for each item offered, any concessions proposed that are not offered to commercial customers and any discounts offered in response to the solicitation.

32.    Solicitation Clause 552.212-70(a) defines "concessions" and "discounts" as follows:

> **Concession** . . . means a benefit, enhancement or privilege (other than a discount), which either reduces the overall cost of a customer's acquisition or encourages a customer to consummate a purchase. Concessions include, but are not limited to freight allowance, extended warranty, extended price guarantees, free installation and bonus goods.

---

[1] *Available online at* https://eoffer.gsa.gov/util/publishedsolicitationutil?solicitationNumber=FCIS-JB-980001-B&refreshAmendNumber=54&scheduleNumber=70&solicitationType=SCHEDULES&isMas=Y. All references to solicitation clauses incorporated into Schedule 70 are to the "Solicitation" portion published at this website.

**Discount** . . . means a reduction to catalog prices (published or unpublished). Discounts include, but are not limited to, rebates, quantity discounts, purchase option credits, and any other terms or conditions other than concessions [*sic*] which reduce the amount of money a customer ultimately pays for goods or services ordered or received. Any net price lower than the list price is considered a "discount" by the percentage difference from the list price to the net price.

33.     MAS contractors who are not manufacturers but rather resellers or dealers, as Carahsoft is in this instance, and which do not have significant sales to the public, which is likewise true of Carahsoft, must provide manufacturer's information about commercial sales of the product the MAS contractor sells to the federal government.

34.     Resellers such as Carahsoft must also provide the Government written authorization from the manufacturer for Government access to the manufacturer's sales records for the purpose of verifying the manufacturer's information.

        **3.     Evaluation of Pricing Information by Contracting Officers.**

35.     Pursuant to GSAM § 538.270-1(a), contracting officers are required to use the provided "evaluation methodology for negotiating MAS offers when the commercial sales practices format is included in the solicitation (see 515.408)." That methodology includes a goal that the Government "will seek to obtain the offeror's best price (the best price given to the most favored customer)" although "there may be legitimate reasons why the best price is not achieved." (*Id.*; GSAM § 538.270-1(c).)

36.     When determining the reasonableness of a price, the contracting officer is directed to "compare the terms and conditions of the MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers." (*Id.*, GSAM § 538.270-1(e).) In negotiating the terms of an MAS contract, government contracting officers therefore rely heavily on the accuracy and truthfulness of the information provided by the offeror regarding its commercial sales.

37.     The importance of providing truthful and accurate information is reinforced

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

by the inclusion of a penalty provision in the MAS contract—GSAM § 552.215-72, which is incorporated into the Schedule 70 Solicitation at Solicitation Clause 552.212-72 ("Solicitation" at 136.) That penalty clause states that the Government is entitled to a reduction in the price of each order issued pursuant to the MAS contract if, after the formation of the contract, the Government discovers that the prices in a contract or modification were inflated due to the contractor's failure to provide current, accurate, and complete information, or to update that information. (*Id.*) The amount of the reduction is the amount by which the Government orders were inflated because of the inaccurate or undisclosed information. (*Id.*) Besides any other available remedies, the penalty clause further states that "the Government may terminate this contract for default." *Id.*

### 4. The Price Reduction Clause.

38. The Schedule 70 solicitation also incorporates Solicitation Clause 552.238-75, governing price reductions (the "Price Reductions Clause" ("PRC")).

39. The PRC requires the offeror and contracting officer to agree on two things: (1) a basis-of-award customer; and (2) the Government's price or discount relationship to that customer. *See* Solicitation Clause 552.238-75(a).

40. The PRC provides that "[a]ny change in the contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction." Solicitation Clause 552.238-75(a).

41. Under the terms of the PRC, a price reduction occurs if the contractor:

    (i)    Revises the commercial catalog, pricelist, schedule or other document upon which the contract award was predicated to reduce prices;

    (ii)    Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which the contract award was predicated; or

(iii)   Grants special discounts to the customer (or category of customers) that formed the basis of the award, and the change disturbs the price/discount relationship of the Government to the customer that was the basis of the award.

Solicitation Clause § 552.238-81(c)(1).

42.   When a price reduction to the benefit of the basis-of-award commercial customer occurs, the contractor must offer the same price reduction to the Government, with the same effective date and for the same time period. The offer of a price reduction to the Government must occur within fifteen days of the effective date of the price reduction for the commercial customer.

43.   When the contractor has already sold its products to the Government at a higher price when this price reduction occurs, the contractor must refund the Government the overcharges, i.e., the difference between the amount paid by the Government and the amount the Government would have paid, had it been charged the same price as the basis-of-award customer.

### 5.   Summary.

44.   In sum, a business that, as Box does, has its products listed through GSA Section 70 MAS is obligated to provide accurate and truthful information. Information about prices and terms offered to commercial customers is critical to this process.

45.   Once a product is on the schedule, a contractor is also required to offer the Government reductions in prices consistent with offers made to commercial customers. This is to ensure that the Government is receiving a "best value" sufficient to justify eliminating any further full and open competition with respect to the product.

### C.   Other Government Procurement of Commercial Items.

46.   Rules and procedures for acquisition of commercial items not purchased through a GSA MAS are provided in FAR Part 12. *See* 48 C.F.R. §§ 12.000 *et seq.*[2] FAR

---

[2] The U.S. Department of Defense ("DoD") acquisitions are further subject to regulations in the Defense Acquisition Regulation Supplement ("DFARS"). *See* DFARS 201.104.

*Complaint* - 10

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

Parts 13 through 15 apply those rules and procedures to particular types of contracts.

47.     Relevant here are regulations related to simplified acquisitions, *see* 48 C.F.R. 48 §§ 13.100 *et seq.*, and negotiated contracts, *see* 48 C.F.R. §§ 15.000 *et seq.*

48.     The regulations define a "commercial item" as:

Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and –

> (i)     Has been sold, leased, or licensed to the general public; or
>
> (ii)    Has been offered for sale, lease, or license to the general public[.]

48 C.F.R. § 2.101.

49.     The regulations further define a "commercially available off-the-shelf" item as a "commercial item" that is sold in the commercial marketplace "in substantial quantities," and is sold to the Government "without modification." 48 C.F.R. § 2.101.

50.     When seeking to purchase commercial items through means other than a GSA MAS, a Contracting Officer "must establish price reasonableness" before the purchase is made. 48 C.F.R. § 12.209. That is, the "fair and reasonable"-standard used for the GSA MAS process also applies here, except that it applies to individual transactions.

51.     The regulations do not allow a Contracting Officer to rely on a price list or catalog price as the basis for a "fair and reasonable" determination, because "[t]he fact that a price is included in a catalog does not, in and of itself, make it fair and reasonable." 48 C.F.R. § 15.403-3(c); *see also*, 48 C.F.R. § 13.106-3(a)(2)(iii) (same).

52.     Under the simplified acquisition process, a Contracting Officer's determination that a price is "fair and reasonable" is preferably based on "competitive quotations or offers," but a Contract Officer may also use market research, price lists, or "any other reasonable basis." 48 C.F.R. § 13.106-3(a).

53.     For negotiated contracts, a Contracting Officer's determination that a price is "fair and reasonable" must be based on a "price analysis." 48 C.F.R. § 15.403-3(c)(1).

The Contracting Officer must document his or her determination that a price is "fair and reasonable" with a Price Negotiation Memorandum ("PNM"). 48 C.F.R. § 406-3(a).

54.     When a price analysis is used, the PNM must include a "summary of the contractor's proposal" in the contract file, as well as "the source and type of data used to support the determination." 48 C.F.R. § 406-3(a)(7).

55.     At a minimum, a price analysis typically[3] involves obtaining "appropriate data, without certification, on the prices at which the same or similar items have previously been sold and determin[ing] if the data is adequate for evaluating the reasonableness of the price." 48 C.F.R. § 15.404-1(b)(1).

56.     Price analysis techniques can also include comparing "proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items," as well as comparing "discount or rebate arrangements." 48 C.F.R. § 15.404-1(b)(2)(ii) and (iii).

## V.     FACTUAL ALLEGATIONS

57.     On information and belief, despite certifying compliance with regulations and contract clauses requiring that it sells its products to the Government at the best price, Box, as a matter of standing policy, sold products to its commercial customers at prices well below those it charged the Government.

58.     Whistleblower, who sold Box products to commercial customers, learned in the course of his employment that Box maintained two separate discount matrixes: One matrix setting out discount percentages available to Government customers who purchase Box products through the GSA MAS, and another matrix for commercial customers.

59.     The discount percentages available to Government customers set out in the first matrix were far smaller than the discount percentages available to commercial customers set out in the second matrix.

60.     Box and Carahsoft made numerous sales of Box products to Government

---

[3] Two exceptions apply. *See* 48 C.F.R. § 15.404-1(b) (price analysis not required if prices are based on adequate price competition or on prices set by law or regulation).

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

customers through the GSA MAS.

61.    The two discount matrices, combined with the records of actual sales to the Government, provide the "particular details" and "reliable indicia" that together support a "strong inference that [false] claims were actually submitted" to the Government. *U.S. ex rel. Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1209 (9th Cir. 2019).

### A.    Box's Products and "List Price" Pricing Structure.

62.    Box's core product is a cloud storage platform. The non-discounted list price that a customer pays for access to this product is determined by four variables: (1) the version of the platform used, (2) the add-ons, if any, purchased, (3) whether the customer buys a package (combining a version of the platform with a pre-determined list of add-ons), and (4) the number of user accounts (or "seats") purchased by the customer. This section discusses these four variables. The next section explains the process for giving customers discounts on the list price.

63.    Box offers four versions of its cloud storage platform to paying customers, distinguished by features such as the size limits for uploads, the number of version histories that are stored on the platform, the number of times the platform can be accessed per month by users, the maximum number of users permitted on an account, and the number of applications that can be integrated with the platform.[4] These four versions of the platform are dubbed, respectively, *Starter*, *Business*, *Business Plus*, and *Enterprise*, with Starter being the least and Enterprise the most expensive version of the platform, and Business and Business Plus falling in between.[5]

64.    Box offers a variety of add-ons that customers can chose to purchase individually, so as to enhance the capabilities of Box's cloud storage platform. These add-ons include *Box Governance*, which allows users to implement document retention policies; *Box Zones*, which enables users to segregate cloud-stored files into separate zones to implement data privacy policies; *Box Shield*, which provides added data security

---

[4] *See* https://www.box.com/pricing.
[5] *See id.*

features; *Box Platform*, which automates file organization; *Box KeySafe*, which allows users to store and control encryption keys; and *Box Relay*, which automates business processes that involve cloud-stored documents, such as onboarding new employees.[6]

65.     Box also offers a set of package deals, which combine a particular version of the platform along with a pre-selected set of add-ons. These package deals include the *Digital Workplace Suite*, which includes the Enterprise version of the Box cloud-storage platform, and the Box Governance, Box Shield, Box Relay, and Box Zones add-ons; and the *Digital Business Suite*, which includes the Enterprise version of the Box cloud-storage platform, and Box Governance, Box Shield, Box Relay, Box Zones, Large File Upload, and Box Platform add-ons.

66.     The final factor determining the list price for a Box product is the number of user accounts, or "seats" as these are referred to internally, purchased. The larger the number of seats purchased, the lower the list price for the product purchased. Box uses the following ten increments in number of seats in setting a list price: (1) 1 to 49 seats; (2) 50 to 99 seats; (3) 10 to 249 seats; (4) 250 to 499 seats; (5) 50 to 999 seats; (6) 1,000 to 2,499 seats; (7) 2,500 to 4,999 seats; (8) 5,000 to 9,999 seats; (9) 10,000 to 24,999 seats; and (10) 25,000 to 1,000,000 seats.[7]

**B.     Box's Two Discount Matrices: One for the Government, and Another One for Commercial Customers.**

67.     The list price, as determined by the four variables outlined above, is only the starting point in determining the price any given Box costumer will pay. In the normal course of business, sales agents (including Whistleblower) often offer potential customers a discount off the list price, so as to entice those customers to choose Box rather than one of Box's competitors for their cloud-based needs.

68.     However, the discount off the list price that a customer can receive depends on whether the customer is a public (*i.e.*, Government) or a private, commercial client, as

---

[6] *See* https://www.box.com/products-and-features.
[7] *See* Exhibits 1 (commercial price matrix) and 2 (GSA price matrix).

Box has two matrixes setting out possible discounts: One for sales to the Government through GSA MAS, and another one for sales to commercial customers.

69.     The discounts off the list price provided for in these two matrices differ drastically, and commercial customers are therefore able to receive a considerably larger discount than the Government.

70.     The matrix setting out possible discounts for **Government customers**, which is attached hereto as Exhibit 2, includes the Manufacturer Suggested Retail Price ("MSRP," *i.e.*, the list price), the "GSA list price" (which represents a discount of about 19% from the list price), and three further discounts: 15% below the GSA list price, 20% below the GSA list price, and 25% below the GSA list price, which corresponds to discounts from the list price of approximately 31%, 35%, and 39%.[8]

71.     Thus, the largest discount percentage that any Government customer who purchased Box products through the GSA could ever receive under this discount matrix is approximately 39% off the list price. *See* Exhibit 2.

72.     On information and belief, and as discussed in Paragraphs 80–92 below, this discount matrix was used in setting prices for Government customers who purchase Box products through GSA MAS Schedule 70.

73.     The matrix setting out possible discounts for **commercial customers**, which is attached hereto as Exhibit 1, sets out the list price (in the "Sales Rep" column"), along with five discount brackets: (1) 0 to 20% (in the "Manager" column); (2) 20 to 40% ("Level 1" column); (3) 40 to 50% ("Level 2" column); (4) 50 to 60% ("Level 3" column); and (5) 60 to 100% off the list price ("Level 4" column).

74.     Sales agents such as Whistleblower required approval from a supervisor to provide discounts to commercial customers, with each discount bracket requiring

---

[8] Note that prices are listed on an annual basis in the matrix setting out possible discounts for Government customers. By contrast, prices in the commercial discount matrix, which is discussed in the text below, are listed on a monthly basis. Thus, the prices in the commercial matrix should be multiplied by 12 to render the list prices comparable across these documents. To illustrate: The Manufacturer Suggested Retail Price ("MRSP") price in Exhibit 2 for up to 50 seats for Business Plus is listed as "$300.00," and as "25.00" (in the "Sales Rep" column) in Exhibit 1.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

approval from a person occupying a more senior position. Discounts in the 0 to 20% bracket required approval from Whistleblower's direct manager, while discounts in the 60 to 100% bracket required approval from Box's Chief Financial Officer ("CFO"), Dylan Smith, with the intervening levels requiring approval from individuals who occupied managing positions of increasing seniority.

75.     Consequently, commercial customers could receive far greater discounts than a Government customer purchasing Box products through the GSA would ever get: The maximum discount available to Government customers, as set out in Exhibit 2, topped out at the second bracket of the discount matrix for commercial customers (20 to 40%) off the list price, which is marked as "Level 1" in Exhibit 1.

76.     As discussed in Paragraphs 95 through 109 below, Box's commercial customers received discounts off the list price that conformed to this matrix.

77.     These two discount matrixes make plain that Box did not intend to treat the Government on the same terms as its commercial customers, but instead intended to sell products to commercial customers at much more favorable prices than those it charged Government customers.

**C.     Box and Carahsoft Sold Millions of Dollars' Worth of Box Products Through the GSA MAS Schedule 70.**

78.     Between 2013 and 2020, the total value of the Box products that Box, with the aid of Carahsoft, sold to Government customers through GSA MAS Schedule 70 was at least $3.45 million.

79.     On information and belief, the prices Box and Carahsoft charged the Government customers listed in Paragraphs 80 through 92 below, as well as other Government customers not listed here, represented discounts of no more than 39% off the list price, in conformity with the GSA discount matrix that is attached as Exhibit 2.

80.     On or around June 10, 2013, the U.S. Army, Mission Installation Contracting Command-Carlisle Barracks purchased Box Enterprise seats and other Box products for a total price of $17,032.50 from Carahsoft through GSA MAS Schedule 70.

*See* Exhibit 3.

81.     On or around June 4, 2015, the Federal Communications Commission purchased Box Enterprise seats for a total price of $43,798.00 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 4.

82.     On or around June 9, 2015, the Federal Communications Commission purchased Box Enterprise seats for a total price of $37,958.80 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 5.

83.     On or around August 11, 2016, the U.S. Department of the Treasury, Bureau of the Fiscal Service, Office of the Inspector General purchased Box products for a total price of $17,131.01 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 6.

84.     On or around January 4, 2017, the U.S. Department of Transportation, John A. Volpe National Transportation Systems Center, Office of the Secretary purchased Box products for a total price of $19,487.00 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 7.

85.     On or around July 11, 2018, the U.S. Department of Labor, Office of the Inspector General purchased Box Enterprise seats and support services for a total price of $3,917.50 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 8.

86.     On or around August 6, 2018, the U.S. Department of Defense, Washington Headquarters Service purchased Box products for a total price of approximately $94,444 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 9.

87.     On or around September 29, 2018, the U.S. Railroad Retirement Board purchased Box Governance seats and support services for a total price of $23,636.50 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 10.

88.     On or around September 19, 2019, the U.S. Railroad Retirement Board purchased Box Governance seats and support services for a total price of $5,842.56 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 11.

89.     On or around December 5, 2019, the U.S. Department of Agriculture, U.S.

Forest Service, IT Support Branch purchased Box Enterprise seats for a total price of $3,178.887.57 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 12.

90.     On or around January 22, 2020, the U.S. Railroad Retirement Board purchased Box Governance seats and support services for a total price of $291.57 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 13. The delivery order associated with this sale was subsequently modified, increasing the total amount paid to approximately $4,374. *See* Exhibit 14.

91.     On or around September 24, 2020, the U.S. Railroad Retirement Board purchased Box Governance seats and support services for a total price of $11,396.88 from Defendant Carahsoft through GSA MAS Schedule 70. *See* Exhibit 15.

92.     The total value of the sales of Box products to the Government documented in Exhibits 3 through 15 is approximately $3,457,904.

93.     On information and belief, the prices that Government customers paid for Box products in the sales reflected in Exhibits 3 through 15 conform to the discount matrix for GSA sales that is attached as Exhibit 2, meaning that the Government received discounts off the list price in the range of 0% to 39%. Put differently, on information and belief, Government customers paid at least 61% of the list price when they purchased Box products from Carahsoft through GSA MAS Schedule 70.

94.     On information and belief, Box, through Carahsoft, made additional sales to Government customers through GSA MAS Schedule 70 beyond the sales reflected in Exhibits 3 through 15, and those Government customers likewise received discounts off the list price that were no greater than 39%.

**D.     Box Sold Its Products at Greatly Discounted Prices to Commercial Customers.**

95.     Box's commercial customers received discounts off the list price that far exceeded the maximum discount of 39% off the list price that is provided for in Box's GSA discount matrix. Indeed, as set forth below, Box's commercial customers received

discounts in excess of 80% off the list price.

96.     On or around April 14, 2017, Best Buy Co., Inc. entered into an agreement to purchase 150 seats for Box Enterprise at a price of $123.75 per seat per year, and 150 seats for Box Governance at a price of $48.15 per seat per year. *See* Exhibit 16.

97.     The price that Box charged Best Buy Co, Inc. in this sale represents a discount of 68.7% and 58.2%, respectively, off the list price for these products, given that (a) the list price per seat for Box Enterprise in the 100 to 249 seats bracket is $394.80 per year; and (b) the list price per seat for Box Governance in the 100 to 249 seats bracket is $115.20 per year. *See* Exhibit 2.

98.     On or around July 1, 2018, Caterpillar Inc. purchased 50,000 seats for Box Enterprise at a price of $36.79 per seat per year. *See* Exhibit 17.

99.     The price that Box charged Caterpillar Inc. in this sale represents a discount percentage of 74.2% off the list price for these products, given that the list price per seat for Box Enterprise in the 50,000 to 999,999 bracket is $142.80 per year. *See* Exhibit 2.[9]

100.    On or around July 31, 2019, Disney Worldwide Services, Inc. purchased 1,700 seats for Box Enterprise at a price of $52.33 per seat per year. *See* Exhibit 18.

101.    The price that Box charged Disney Worldwide Services, Inc. in this sale represents a discount percentage of 81.9% off the list price for these products, given that the list price per seat for Box Enterprise in the 1,000 to 2,499 seats bracket is $289.80 per year. *See* Exhibit 2.

102.    On or around October 30, 2019, Nissan North America purchased 1,250 seats for Box Enterprise at a price of $106.50 per seat per year and 1,250 seats for Box Governance at a price of $43.50 per seat per year. *See* Exhibit 19.

103.    The price that Box charged Nissan North America in this sale represents a discount percentage of 63.3% and 54.7%, respectively, off the list price for these products, given that (a) the list price per seat for Box Enterprise in the 1,000 to 2,499

---

[9] The discount percentages reflected in this and the following paragraphs are calculated as follows: ((list price – sales price) / list price) x 100.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

seats bracket is $289.80 per year; and (b) the list price per seat for Box Governance in the 1,000 to 2,499 seats bracket is $96.00 per year. *See* Exhibit 2.

104.    On or around April 3, 2020, Guaranteed Rate, Inc. purchased 4,100 seats for Box Enterprise at a price of $84.15 per seat per year and 4,100 seats for Box Governance at a price of $22.44 per seat per year. *See* Exhibit 20.

105.    The price that Box charged Guaranteed Rate, Inc. in this sale represents a discount percentage of 64.8% and 75.1%, respectively, off the list price for these products, given that (a) the list price per seat for Box Enterprise in the 2,500 to 4,999 seats bracket is $239.40 per year; and (b) the list price per seat for Box Governance in the 2,500 to 4,999 seats bracket is $90.00 per year. *See* Exhibit 2.

106.    On information and belief, Box has sold its products to numerous other commercial customers at prices that represent discounts off the list price in a range that is similar to those reflected in Exhibits 16 through 20.

107.    On information and belief, the discounts offered by Box to its commercial customers exceed the discounts offered to Government customers, including but not limited to Government customers who purchased through GSA MAS Schedule 70.

108.    On information and belief, the commercial customers that received discounts that exceed the discounts offered to the Government are or could be basis-of-award customers for purposes of the PRC.

109.    Consequently, (a) Box should have offered Government customers the same discounts it offered to these commercial customers, but it did not, and (b) Box should have refunded the Government for the overcharges that resulted from the discrepancy between the prices Box charged the Government and the prices Box charged its commercial customers, but it did not.

**E.    Box and Carahsoft Also Sold Box Products Through Other Contract Vehicles Without Offering the Government the Same Discounts that Box's Commercial Customers Received.**

110.    Box and Carahsoft did not only sell Box products through GSA MAS

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

Schedule 70, but also under other IDIQ contract vehicles, including NASA SEWP V and ITES-SW.

111.   On information and belief, the prices at which Box products were sold to the Government through these other contract vehicles did not reflect the discounts that Box offered to its commercial customers.

112.   On information and belief, Box did not disclose, as part of those sales, the discounts that it offered to its commercial customers, thereby failing to provide full and complete information to the Government, and rendering Contracting Officers unable to make a fully informed determination whether the price paid was "fair and reasonable."

113.   As a result, on information and belief, the prices paid by the Government for Box products in some or all of these sales were not "fair and reasonable."

**F.   Defendants Acted with *Scienter*.**

114.   Neither Box nor Carahsoft can plausibly profess ignorance of either their obligations under the FAR and the GSA MAS, or their respective failures to live up to those obligations.

115.   The facts in the above paragraphs, and throughout this Complaint indicate that Box knowingly overcharged the Government for products sold at significantly lesser prices to commercial customers, or at minimum, acted with deliberate ignorance and/or reckless disregard of the truth or falsity of information provided to the Government related to the pricing of its products. Therefore, Box acted with *scienter*, as that term has been understood for purposes of the FCA.

116.   First, Box's Code of Conduct, attached hereto as Exhibit 21, reflects an awareness of the special nature of sales to the Government. As the Code of Conduct notes, "[b]usiness-to-business arrangements are one thing, but working with a government of any kind – U.S. (federal, state or local) or foreign – requires special care. Because government officials are obligated to follow specific codes of conduct and laws, we need to take special care when doing business with government procurement." Exhibit 21, at p. 9.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

117.   While Box's Code of Conduct does not specifically call attention to pricing regulations, the message is clear: Box employees, including its management, must take care to follow all applicable laws and regulations in their dealings with the Government.

118.   Second, Box is a well-established, publicly traded company that plainly has the resources to be well-acquainted with its obligations under the GSA MAS regulations to (1) provide truthful pricing information to the Government at the outset of its contractual relationships; (2) inform the Government when it provides concessions or discounts to comparable basis-of-award customers that should also be given to the Government; (3) provide the same concessions and discounts to the Government as it gives to its comparable basis-of-award customers; and (4) refund overcharges to the Government as required by the regulations.

119.   Finally, Box's C-suite cannot plausibly claim to be unaware of its discount practices, given that, for certain discount percentages, approval from Box's CFO, Dylan Smith, is required. As alleged above, discounts at levels requiring approval from Mr. Smith have been granted on various occasions, meaning that Mr. Smith has direct and personal knowledge of the discounts that Box's customers receive.

120.   This conduct is equally egregious and illegal whether Box provided inflated prices directly to the Government or through information provided to third-party resellers.

121.   Carahsoft is a highly experienced third-party reseller to the Government, and it has sold Box products to the Government through the GSA MAS for numerous years. Accordingly, Carahsoft cannot claim ignorance of its obligations to provide the Government with prices that are fair and reasonable as compared to commercial customers.

122.   Carahsoft faces potential liability for fraudulent sales and failure to refund as a result of its knowing or reckless disregard for the "best price" obligations imposed by FAR and the GSA MAS, to the extent that Carahsoft, (1) when selling Box products to Government entities, allowed Box to negotiate prices for Government entities that were

not fair and reasonable as compared to the prices Box charged to commercial customers, and (2) turned a blind eye to Box's highly discounted commercial sales prices, and the obligations that concessions and reductions placed on third-party resellers to the Government.

**G.   Defendants' Omissions and Misrepresentations Regarding Discounts Offered to Commercial Customers Were Material to the Government's Decision to Pay.**

123.   "[P]rice is an unambiguously material condition under the FCA." *U.S. ex rel. Bierman v. Orthofix lnt'l, N.V.,* 177 F. Supp. 3d 712, 715 (D. Mass. 2016) (*citing U.S. ex rel. Shemesh v.* CA, Inc., 89 F. Supp. 3d 36, 51 (D.D.C. 2015)).

124.   If Defendants had disclosed the steeply discounted prices for Box products offered to non-government, best-of-award customers, this disclosure would have affected the Government's determination of whether the price offered to the Government for the same products in comparable quantities was "fair and reasonable." Moreover, the Government would have purchased the lower-priced products if they were offered.

125.   By their conduct, Defendants deprived the Government of the ability to arrive at a fair and reasonable price for its purchase of Box products, and instead submitted or caused to be submitted claims for those products with inflated prices.

126.   Because of Defendants' fraudulent conduct, the Government overpaid significantly when it purchased Box products that Box offered to commercial customers for far less money.

127.   The Government was further damaged whenever Defendants did not refund a price concession or refund that it offered to a non-government, best-of-award customer.

128.   Thus, the Government paid more for those products than it would have if Defendants had provided truthful and complete information about its sales to commercial customers.

//
//

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

## V.    COUNTS

### Count I: Federal FCA, 31 U.S.C. § 3729(a)(1)(A)

129.    Relators reallege each and every paragraph of this Complaint.

130.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

131.    As a result of the Defendants' actions, the United States has been, and may continue to be, severely damaged.

### Count II: Federal FCA, 31 U.S.C. § 3729(a)(1)(B)

132.    Relators reallege each and every paragraph of this Complaint.

133.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims, in violation of  31 U.S.C. § 3729(a)(1)(B).

134.    The United States, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these records or statements, paid false or fraudulent claims.

135.    As a result of Defendants' actions, the United States has been, and may continue to be, severely damaged.

### Count III: Federal FCA, 31 U.S.C. § 3729(a)(1)(G)

136.    Relators reallege each and every paragraph of this Complaint.

137.    As detailed above, Defendants knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

138.   As a result of Defendants' actions, the United States has been, and may continue to be, severely damaged.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator Kevin Klimaszewski requests that this Court:

A.   Enter judgment for the United States Government and the Relator and against Defendants;

B.   Order Defendants to cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

C.   Award the United State Government three times the amount of the actual damages sustained by the government as a result of Defendants' violations of the False Claims Act as alleged in this Complaint;

D.   Assess civil penalties in the maximum amount available against the Defendants for each and every false claim Defendants submitted to the United States government in connection with the false statements and false claims alleged in this Complaint;

E.   Award Relators the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

F.   Award prejudgment interest;

G.   Award Relators statutory attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);

H.   Grant such other relief as the Court may deem just, necessary, and proper.

## DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury.

Dated: May 5, 2021            /s/ Felicia Gilbert
                                            Felicia Gilbert (CA Bar #276348)
                                            SANFORD HEISLER SHARP, LLP
                                            111 Sutter Street, Suite 975
                                            San Francisco, CA 94104
                                            Tel: (415) 795-2020
                                            Fax: (415) 795-2021

fgilbert@sanfordheisler.com

H. Vincent McKnight, Jr.
  (DC Bar #293811)
John McKnight (DC Bar #1031354)
Robert Van Someren Greve
  (DC Bar # 1617234)
SANFORD HEISLER SHARP, LLP
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 200003
Tel: (202) 499-5211
Fax: (202) 499-5199
vmcknight@sanfordheisler.com
jmcknight@sanfordheisler.com
rvansomerengreve@sanfordheisler.com

*ATTORNEYS FOR RELATORS*